IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.  04-cv-02042-LTB-OES

NELSON B. PHELPS,

Plaintiff,

v.

QWEST EMPLOYEES BENEFIT COMMITTEE,

Defendant.

_____

ORDER

_____

The plaintiff, Nelson B. Phelps, filed this lawsuit seeking penalties, pursuant to Section 1024(b)(4) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), for the alleged failure of the defendant, Qwest Employees Benefit Committee ("Committee"), to produce upon Mr. Phelps' request documents pertaining to the Committee's management of a pension fund of which Mr. Phelps is a beneficiary.  The Committee moves for summary judgment.  The motion is adequately briefed and oral argument would not materially aid its resolution.  For the reasons stated below, I GRANT the motion in part and DENY it in part.

## I.  Facts

The following facts are undisputed, except where otherwise noted.  The Committee is the administrator, having fiduciary obligations, of a pension plan ("Plan") sponsored by Qwest Communications International, Inc. ("Qwest") for the benefit of Qwest's employees and retirees.

Mr. Phelps is a former employee, now retired, of US West, Inc. ("US West"), Qwest's predecessor in interest.  He participates in the Plan.

While the Committee exercises authority over interpretation and enforcement of the Plan's provisions, Qwest has entrusted management and investment of the Plan's assets to a fiduciary denominated Qwest Asset Management Company ("QAM").  QAM, in turn, delegates investment and management responsibilities to various trustees and investment managers.  However, the Plan expressly provides that QAM shall retain authority to "approv[e] processes and policies for payment of investment-related Plan expenses, and the authority to determine asset allocation ranges and general investment strategies for Plan assets."  Plan § 8.8(b).  QAM also has the authority to retain and fire investment managers and trustees.

The Plan explicitly contemplates the creation of one trust ("Pension Plan Trust") by agreement between Qwest and Boston Safe Deposit and Trust Company ("BSDTC").  The Plan designates BSDTC the original trustee, responsible for investing, managing, retaining, and disposing of assets entrusted to it by the Committee and QAM.  References in the record to entities named "Pension Trust," "Occupational Health Trust," "Qwest Savings & Investment Plan," and "Foundation Trust" are not explained.  In addition, Mellon Trust of New England, NA ("Mellon") is the trustee of an entity called the "Qwest Pension Fund."  The relations, if any, among the Qwest Pension Fund, the Pension Trust, the Pension Plan Trust, the Plan, and the other named trusts and plans are not revealed.  Also a mystery are the identities of investment management companies with which QAM claims to have contracted for management of assets pursuant to the Plan and the relationship, if any, between BSDTC and Mellon.

On August 15, 2003, concerned over the efficacy of a decision in October, 2001 by QAM or

one of its delegates to invest in an instrument known as a put option, Mr. Phelps wrote to the Committee, which the Plan requires to maintain all Plan records, demanding production of, among other documents, the Plan, trust agreements, an annual report, and a then-current financial statement. Here, a gap appears in the record. Qwest claims that it complied with that request, which Mr. Phelps denies. Neither party has produced evidence by which I might determine the extent of Qwest's compliance at that time.

On January 9, 2004, Mr. Phelps again corresponded, this time specifically requesting "a copy of the Qwest Pension Plan investment policy guidelines or blueprint used in the design and implementation of Qwest Pension Plan investment program in effect during year 2001." Complaint, 10; Affidavit of Nelson B. Phelps ("Phelps Affidavit"), ¶ 5. The parties do not dispute that Qwest refused, by letter of February 13, 2004, to honor that request.

On April 22, 2004, Mr. Phelps again wrote to the Committee demanding production of a document entitled "US West Trust Investment Proxy Voting Policy" and all amendments, revisions, and "successor documents," as well as "the *records of the proxy voting activities for the past two years*." Complaint, 13 (emphasis original); Phelps Affidavit, ¶ 5. Qwest declined to comply.

The Committee proffers the affidavit ("Frame Affidavit") of Karen Frame, QAM's Chief Compliance Officer. Ms. Frame affirms that QAM does not have a stand-alone statement of investment policy and the Plan does not provide for one. Instead, investment decisions are governed by portfolio-specific guidelines, written for and incorporated into the various contracts between QAM and its investment managers. Each set of guidelines is unique to the assets managed by each investment manager. Because the investment agreements are amended occasionally, Ms. Frame assumes, though she does not claim to know, that the sundry sets of guidelines have not survived

unaltered since 2001.

Ms. Frame identifies two policies of general application that govern management of the Plan. First, an assets allocation policy sets out target allocation percentages for asset classes held by the Pension Trust.  Plan fiduciaries disclose allocations annually by way of filings with the Securities and Exchange Commission ("SEC").  Second, on August 1, 1994, QAM adopted a Derivatives Policy for Qwest Trusts ("Derivatives Policy"), which it amended in December, 1996, July, 1997, November, 1998, January, 2002, and March, 2004.  The Derivatives Policy governs investments only in derivatives, instruments that payoff according to the value of an underlying security, commodity, interest rate, or index.

Finally, Ms. Frame explains that US West's trust investment management company had until 1995 a general policy governing proxy voting.  QAM has no such policy.  Instead, QAM delegates proxy voting authority to investment managers or, in the case of internally-managed portfolios, to the trustee.  Each individual delegation of authority is made by contractual agreement.  Mellon has a proxy voting policy, as do other investment managers that Qwest has retained.

The Committee has produced a log of the documents that it believes are responsive to Mr. Phelps production demands, which it refuses to produce.  Itemized are a proxy voting policy, dated August 20, 2004, of Mellon Financial Corporation, Mellon's parent corporation; a derivatives policy, dated March 5, 2002, for "Qwest Trusts;" and portfolio-specific guidelines that QAM has adopted in contractual agreements with each of its unidentified investment managers.

## II.  Discussion

The purpose of a summary judgment motion is to assess whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  I shall grant summary judgment if the pleadings,

4

depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The non-moving party has the burden of showing that there are issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial.  *Id.* at 323;  *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.  *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed. R. Civ. P. 56(e).  These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves."  *Celotex* at 324.

The Complaint states two claims, one for the Committee's refusal to produce investment policy guidelines and one for its refusal to produce a proxy voting policy.  The parties dispute the meaning of the filing and information production requirements of ERISA, which provide, *inter alia*,

Publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:

(1) The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes referred to in section 1022(a)(1) of this title – (A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits, or

(B) if later, within 120 days after the plan becomes subject to this part.

...

(4) The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.  The administrator may make a reasonable charge to cover the cost of furnishing such complete copies.  The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C. § 1024(b).

Mr. Phelps does not argue that the documents he has requested constitute "the latest updated summary, plan description, ... the latest annual report, any terminal report, the bargaining agreement, trust agreement, [or] contract" under § 1024(b)(4).  The case turns, then, on the meaning of the catch-all phrase, "other instruments under which the plan is established or operated."  Though no Tenth Circuit authority appears on this question, other circuits have paid careful attention to it and have concluded that the unambiguous phrase connotes formal legal documents governing the Plan. *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142 (2d Cir. 1997); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996), *cert. denied*, 519 U.S. 1077, 117 S. Ct. 738, 136 L. Ed. 2d 677 (1997); *Ames v. American Nat. Can Co.*, 170 F.3d 751, 758 (7th Cir. 1999); *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1274 n.8 (11th Cir. 2005). These include contracts and other documents that direct the affairs of the Plan.  *Weinstein*, 107 F.3d at 142; *Faircloth*, 91 F.3d at 653.  They do not include benefits projections or other documents that do not govern plan management, amendment, or administration.  *Cotton*, 402 F.3d at 1274 n.8.

## A.       Portfolio-specific guidelines

As Mr. Phelps points out, the *Faircloth* court held that funding and investment policies come under the mandate of § 1024(b)(4).  The court reasoned that "both the funding policy and the

investment policy are formal documents under which the [plan] is managed.  They are therefore encompassed by [§ 1024(b)(4)]." *Faircloth*, 91 F.3d at 656.  I find that reasoning persuasive.

The conclusion that the portfolio-specific guidelines at issue here constitute "other instruments" within the meaning of § 1024(b)(4) is further commended by the Department of Labor's Interpretive Bulletin 94-2, codified at 29 C.F.R. § 2509.94-2.  It states, "Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA § 404(a)(1)(D)."  29 C.F.R. § 2509.94-2(2).  Though, as the Committee points out, the purpose of 29 C.F.R. § 2509.94-2 is not to interpret 29 U.S.C. § 1024(b), the Department of Labor's conclusion that statements of investment policy govern the plan weighs heavily in favor of Mr. Phelps' interpretation of the statute.

Citing *Ames*, 170 F.3d at 758, the Committee argues that the portfolio-specific guidelines do not govern the plan.  To state this argument is to refute it.  The Committee does not suggest any purpose that its contracted-for guidelines might serve other than governing how plan assets are to be invested and managed.  Nevertheless, the Committee argues that each set of guidelines binds only one portfolio manager, and so no single set can be said to govern the entire Plan.  This deconstructive semantic exercise is unavailing.  That the Committee has chosen to adopt several documents to govern investment of Plan assets rather than one is reason to require it to produce all, not none, of those documents that come within the statute.

Citing *Brown v. American Life Holdings, Inc.*, 190 F.3d 856, 862 (8th Cir. 1999), the Committee characterizes the guidelines as evidence of the operation of the Plan, rather than instruments that govern it, equivalent to written communications between Plan fiduciaries.  However, Mr. Phelps has not requested correspondence but documents containing words of operative effect.

These documents do not merely evidence how the Plan is governed; they govern it. The Committee, therefore, is not entitled to judgment as a matter of law.

The Committee argues that its production obligation extends only to current documents, not to guidelines in effect during October, 2001. It cites *Shields v. Local 705, Intern. Broth. of Teamsters Pension Plan*, 188 F.3d 895, 903 (7th Cir. 1999) and *Leung v. Skidmore, Owings & Merrill LLP.*, 213 F. Supp. 2d 1097, 1105 (N.D. Cal. 2002) for that proposition. *See also*, *Colin v. Marconi Commerce Systems Employees' Retirement Plan*, 335 F. Supp. 2d 590, 613 (M.D.N.C. 2004). I need not resolve this question for two reasons. First, assuming without deciding that the Committee's reading of the statute is correct, the Committee has not turned over even the current guidelines. Second, Ms. Frame's affidavit statement that QAM is in the habit of amending contracts with its delegates is immaterial to the question whether any of the various guidelines have been amended since October, 2001. Mr. Phelps doubts that the documents were amended before he requested them and Ms. Frame's speculation to the contrary does not rise to the level of evidence.

The Committee cites an unpublished decision from the Northern District of Ohio, *Hickey v. Pennywitt*, 2004 WL 1304933 (N.D. Ohio 2004), of which it has provided no copy, D.C. Colo. L. Civ. R. 7.1.D, in which the district court held that investment guidelines are not documents which provide a plan participant with information concerning how a plan is operated, and therefore are not subject to production pursuant to § 1024(b)(4). To the extent, if at all, that the unpublished *Hickey* decision contradicts 29 C.F.R. § 2509.94-2 and *Faircloth*, I find its holding unpersuasive.

**B.    Derivatives Policy**

For the same reasons, the Committee is not entitled to summary judgment on Mr. Phelp's claim for the Derivatives Policy. Whether the Derivatives Policy governs the type of investment

8

about which Mr. Phelps is concerned is irrelevant to the narrow question whether the statute requires the Committee to produce the document. Ms. Frame's affidavit does establish that the Derivatives Policy has been twice amended since October, 2001. However, even assuming that the Committee has no obligation to produce outdated versions of the document, it has not produced the current version.

## C.    Proxy voting policy

The Committee argues that it need not produce the various proxy voting policies of its delegates because it has not adopted those policies and does not have them in its possession. Mr. Phelps disputes that proposition but cites no authority. The Committee cites *Staib v. Vaughn Industries, Inc.*, 171 F. Supp. 2d 714, 716 (N.D. Ohio 2001), in which the court declined to order production of documents that did not exist. The Committee has not established that no proxy voting policies exist, only that all such policies are outside its control. In other words, it has delegated proxy voting to its subordinate trustees and investment managers without dictating the terms of the governing policies.

The context of 29 U.S.C. § 1024(b) indicates that the proxy voting policies do not come within subsection (b)(4). The statute requires plan fiduciaries to produce documents that inform participants how fiduciaries are fulfilling their obligations. Mr. Phelps does not argue that the Plan requires the Committee or QAM to formulate proxy voting policies and it is undisputed that both the Committee and QAM decline to perform that function. Neither party has explained whether QAM's fiduciary obligations under ERISA include the responsibility to vote proxies. Also unexplained is whether a fiduciary obligation to exercise proxy voting rights might arise from some other state or federal law. I am thus obliged to conclude that the happenstance that certain delegates of QAM have

9

adopted their own internal proxy voting policies does not bear upon QAM's obligation to produce documents it has not adopted.

Accordingly, it is ORDERED that

1) the Committee's motion for summary judgment is GRANTED with respect the proxy voting policy and DENIED with respect to the investment guidelines; and

2) Mr. Phelps' second claim for relief is DISMISSED.

Dated: December  2 , 2005, in Denver, Colorado.

BY THE COURT:

    s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge

10